UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SITTHISAK V. CHANSAMONE,

                        Plaintiff,

v.                                                            10-CV-0147-JTC

NRG NORTHEAST AFF SERVICE INC.,

                        Defendant.
_____

This case has been transferred to the undersigned for all further proceedings. Plaintiff Sitthisak V. ("Jimmie") Chansamone brought this action on February 23, 2010, against defendant NRG Northeast Affiliate Services, Inc. ("NRG"),[1] alleging discrimination in employment pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), and New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297. Pending for determination is NRG's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Item 56. Upon consideration of the record as a whole, including the parties' written submissions and oral arguments, defendant's motion for summary judgment is granted.

## BACKGROUND

The following undisputed facts are derived from the parties' Statements of Material Facts filed in accordance with Rule 56 of the Local Rules of Civil Procedure for the Western

---

[1] Plaintiff also named the International Brotherhood of Electrical Workers ("IBEW") Local 97 as a defendant. By stipulation of counsel dated April 26, 2011, the action was discontinued with prejudice as against IBEW Local 97. Item 47.

District of New York (*see* Items 56-5, 64), as well as from the pleadings, affidavits, exhibits, deposition transcripts, and other submissions on file.

Plaintiff is of Asian descent, born in Laos. He was hired by NRG in November 2003. NRG operates two electricity-generating plants in Western New York – one located in Tonawanda (referred to as the "Huntley Plant"), and the other located in Dunkirk (referred to as the "Dunkirk Plant"). Plaintiff worked as a "Coal Handler" at the Huntley plant from November 2003 until March 2005, when he voluntarily left to help his family with their construction business in California. He was re-hired by NRG in January 2006, and returned to the Huntley Plant where he worked as a Coal Handler until his resignation in June 2007.

At all times during his employment with NRG, plaintiff was a dues-paying member of the International Brotherhood of Electrical Workers ("IBEW"), Local 97. Under the collective bargaining agreement ("CBA") between NRG and Local 97 governing the terms of plaintiff's employment, union workers are categorized under various classifications, such as "Part-Time Employee," "Temporary Employee," "Probationary Employee," and "Regular Employee." *See* CBA, Article VI, Sections 1-4 (Item 57-3, pp. 8-9). The position of Coal Handler–essentially, an entry-level job involving operation and maintenance of equipment used to transport coal during the power-generating process–is classified under the category of "Temporary Employee." The CBA defines a "Temporary Employee" as:

> one hired for a specific job of limited duration not exceeding six (6) months, except that this period may be extended by mutual agreement. The Company and the President/Business Manager of Local Union 97, IBEW or designee will discuss those cases where in the opinion of either the use of a temporary employee continues so long as to indicate that a regular job exists.

*Id.* at 9. At all times during both periods of his employment at NRG, plaintiff held the position of Coal Handler under "Temporary Employee" status.

Between February and August 2006, plaintiff bid on nine different jobs posted for various higher-paying positions which became available at both NRG facilities. The CBA sets forth the following procedure for bidding on open jobs:

> (a) Unless otherwise mutually agreed upon by the Company and the Brotherhood, the Company shall post the notice of a job vacancy on bulletin boards for five (5) working days within the division. After a job is posted it will not be withdrawn unless mutually agreed to.
>
> (b) Except for vacancies to be filled by job seniority, all vacancies shall be posted for a period of five (5) days throughout the Division. Bids submitted will consider regular employees of the Western Division (including laid off employees on the preferential rehiring list) in order of their company seniority. Employees not on regular status are not eligible bidders, but they may use the standard bid form to express their interest in vacancies. There is no obligation on the Company to consider such employees, whether or not there are regular bidders.
>
> If there is no qualified bidder, the vacancy may then be filled by outside hiring. After a job is posted, it will not be withdrawn unless mutually agreed to.

CBA, Appendix A, Section B(3) (Item 57-3, p. 41).

Plaintiff was not offered an interview for any of those nine positions. Eight of the positions were filled by current NRG employees with greater seniority within the company, or by external applicants determined by NRG management to possess superior employment experience and qualifications. *See* Item 56-5 (Deft. Local Rule 56 Statement), ¶¶41-48. The ninth position, "Utility Mechanic B" at the Dunkirk facility (Vacancy No. D2006-25), was awarded to an external applicant named Kevin Donahue on August 16, 2006. *Id.* at ¶¶55-56; *see also* Item 57-4 (Bid Package for Vacancy No. D2006-25); Item 57-5 (NRG Offer Letter 9/16/06).

In early August 2006, prior to the offer of employment to Mr. Donohue, plaintiff telephoned Carson Leikam, Operations Manager at the Dunkirk facility, to ask when he would be interviewed for Vacancy No. D2006-25.  Plaintiff testified at his March 31, 2011 deposition in this action that he had never met or spoken with Mr. Leikam prior to this phone call, but he knew Mr. Leikam was the person in charge of hiring at the Dunkirk facility.  Item 56-2 (Chansamone Dep.), p. 88.  During the phone call, Mr. Leikam told plaintiff that, as a "Temporary Employee," he had no bidding rights under the CBA.  *Id.* at 93, 96; *see also* Item 56-4 (Leikam Dep.), pp. 97-98, 100-02.

Plaintiff bid on twelve more union jobs posted between August 2006 and April 2007, but was not hired or interviewed for any of those positions.  He resigned from his employment with NRG on June 29, 2007.

On October 24, 2007, plaintiff filed a verified complaint with the New York State Division of Human Rights ("NYSDHR"), charging NRG with unlawful discriminatory practices relating to employment in violation of New York Human Rights Law and Title VII of the Civil Rights Act of 1964.  *See* Item 1, pp. 17-18.  He alleged that, because of his race, he was denied the opportunity to interview for positions at the Dunkirk facility, and was denied promotion to permanent employment status.  He also claimed that he was subjected to racial slurs by a fellow employee in the presence of a supervisor, who took no corrective action.  He alleged that he was forced to resign due to stress-related physical ailments.  *Id.*

After investigation, and upon a finding of probable cause, the NYSDHR referred the case to public hearing.  The case was assigned to an administrative law judge ("ALJ"), and a hearing session was scheduled for January 15, 2010, to address jurisdictional issues.

At the hearing, plaintiff submitted a written request for dismissal of the administrative complaint in order to pursue his remedies in federal court. Counsel for NRG objected, citing costs associated with earlier adjournments. However, on January 29, 2010, the ALJ issued an order dismissing the complaint on the grounds of administrative convenience, pursuant to Section 297.3(c) of the N.Y. Human Rights Law, *id.* at 24-25, and on February 9, 2010, the E.E.O.C. issued a Notice of Dismissal and Right to Sue. *Id.* at 21-23.

Plaintiff filed this action *pro se* on February 23, 2010, alleging that NRG intentionally discriminated against him based on his race and national origin by failing to offer him an interview for any of the twenty-one positions for which he applied, despite being the "#1 Bidder." Item 1, p. 7. He also claimed that he was subjected to racial slurs and intimidation at the hands of non-management co-workers, which created a hostile work environment resulting in his constructive discharge form NRG on June 29, 2007.[2] *See id.* at 9.

Following discovery, and unsuccessful referral to mediation pursuant to the court's Plan for Alternative Dispute Resolution, defendant moved for summary judgment dismissing the complaint in its entirety. Defendant contends that, as reflected by plaintiff's deposition testimony,[3] plaintiff has conceded that the vast majority of the twenty-one positions applied for were filled by internal "Regular" or "Temporary" status NRG employees with greater seniority rights, or by external candidates with better credentials. With respect to the remaining positions, defendant contends that plaintiff cannot meet his initial burden

---

[2] On his form Discrimination Complaint, plaintiff also checked the space provided for asserting a claim that defendant retaliated against him for complaining about discrimination or harassment. *See* Item 1, p. 4. This claim has been withdrawn. *See* Item 65, p. 12.

[3] Plaintiff's deposition took place over two days, on March 31 and April 19, 2011. Plaintiff was represented at the deposition by Gregory G. Paul, Esq. who, on February 15, 2011, entered a Notice of Appearance as plaintiff's counsel in this matter. Item 38.

of establishing *prima facie* race-based employment discrimination because there is no basis upon which a trier of fact could conclude that any of those employment decisions involved discriminatory animus. Alternatively, defendant argues that even if plaintiff could meet his initial burden, NRG has proffered legitimate, non-discriminatory reasons for its employment decisions, and plaintiff has failed to produce any evidence to suggest that those reasons were a mere pretext for discrimination. Finally, defendant contends that plaintiff's allegations regarding the offensive behavior of his co-workers fall far short of the type of "extreme" conduct necessary to establish an objectively hostile work environment.

In response to the summary judgment motion, plaintiff has indeed conceded that all but five of the positions he applied for were properly filled by internal candidates with more seniority, or by better-qualified external candidates. He argues that genuine issues of fact exist with respect to the reasons proffered by defendant for filling those remaining positions by hiring external applicants without any on-the-job experience or seniority, as well as with respect to the totality of circumstances pertaining to his hostile work environment claim, precluding summary judgment in defendant's favor.

For the reasons that follow, the court finds that defendant is entitled to summary judgment dismissing plaintiff's complaint in its entirety.

## DISCUSSION

**I.     Summary Judgment**

Rule 56 provides that, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the language of this Rule

has been amended in recent years, the well-settled standards for considering a motion for summary judgment remain unchanged. *See, e.g., Faulkner v. Arista Records LLC*, 797 F. Supp. 2d 299, 311 n. 7 (S.D.N.Y. 2011); Fed. R. Civ. P. 56, Committee's notes to 2010 amendments. Under those standards, the moving party bears the initial burden of establishing that no genuine issue of material fact exists. *Rockland Exposition, Inc. v. Great American Assur. Co.*, 746 F. Supp. 2d 528, 532 (S.D.N.Y. 2010), *aff'd*, 445 F.App'x 387 (2d Cir. 2011). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law …." *Id.*

Once the court determines that the moving party has met its burden, the burden shifts to the opposing party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars showing that a trial is needed …." *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotation marks and citation omitted), *quoted in Kaminski v. Anderson*, 792 F. Supp. 2d 657, 662 (W.D.N.Y. 2011). In considering whether these respective burdens have been met, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks and citation omitted).

The Second Circuit has also held that, when deciding whether summary judgment should be granted in an employment discrimination case, the court "must take additional considerations into account." *Desir v. City of New York*, 2011 WL 5176178, at *1 (2d Cir. Nov. 2, 2011) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)). As stated in *Gallo*:

> A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue. Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.

*Gallo*, 22 F.3d at 1224. Nonetheless, summary judgment remains appropriate in discrimination cases, as "the salutary purposes of summary judgment–avoiding protracted, expensive and harassing trials–apply no less to discrimination cases than to … other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *see also Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."), *cert. denied*, 534 U.S. 993 (2001); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (affirming grant of summary judgment in favor of employer based on plaintiff's failure to produce evidence of pretext), *cert. denied*, 540 U.S. 811 (2003).

## II. Title VII

Title VII makes it unlawful "for an employer ... to fail to hire or to discharge any individual, or otherwise to discriminate against any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII provides redress against employers who discriminate against individuals in the work

place under two theories: (1) disparate treatment (or "quid pro quo" discrimination), and (2) "hostile work environment."  *See Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).

### A. Disparate Treatment

Claims of disparate treatment in employment are analyzed under the burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).[4]  *See, e.g., Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004); *Phillips v. Marriott Int'l, Inc.*, 2010 WL 1269772, at *4 (E.D.N.Y. Mar. 30, 2010).  Under this framework, the plaintiff must first establish a *prima facie* case of discrimination by demonstrating that: 1) he was in a protected group; 2) he was qualified for the position; 3) he was subject to an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  *See Terry v. Ashcroft*, 336 F.3d 128, 137–38 (2d Cir. 2003); *Collins v. N.Y. City Trans. Auth.*, 305 F.3d 113, 118 (2d Cir. 2002).  As the Supreme Court has explained, the plaintiff's *prima facie* burden "is not onerous.  The plaintiff must prove by a preponderance of the evidence that [ ]he applied for an available position for which [ ]he was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *see also Weinstock*, 224 F.3d at 42 (plaintiff's burden of proof at *prima facie* stage is "*de minimis*").

Once the plaintiff has established a *prima facie* case of discrimination, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802.  In other words, "[t]he defendant

---

[4] The same standards apply to employment discrimination claims brought under New York Executive Law § 296.  *See Weinstock*, 224 F.3d at 42 n.1 (citing cases).

must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotation marks omitted).

Upon the defendant's proffer of a legitimate non-discriminatory reason for its employment action, "the presumption of discrimination arising with the *prima facie* case drops from the picture … [and] the plaintiff must then establish that the defendant's proffered reason is a mere pretext for actual discrimination." *Weinstock*, 224 F.3d at 42 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 510–11); *see also Fisher v. Vassar Coll.*, 114 F.3d 1332, 1336 (2d Cir. 1997), *cert. denied*, 522 U.S. 1075 (1998). To demonstrate pretext:

> The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action. In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.

*Weinstock*, 224 F.3d at 42 (internal quotation marks, citations, and alterations omitted).

Defendant does not challenge plaintiff's *prima facie* showing with respect to his membership in a protected group, his qualification for the positions sought, or his having suffered adverse employment action as a result of being denied interviews for those positions. Defendant does challenge plaintiff's showing with respect to the remaining element of his *prima facie* case: *i.e.*, that the interviews were denied under circumstances giving rise to an inference of discrimination. Defendant also argues that, even if the court should find plaintiff's *prima facie* burden satisfied, NRG has articulated a legitimate non-

discriminatory reason for each of its employment decisions, and plaintiff has produced no evidence to show or suggest that NRG's reasons were false, and that more likely than not discrimination was the real reason for the employment action.

In this regard, the court's review of the parties' submissions, including the cited deposition testimony, makes clear that plaintiff has conceded the propriety of NRG's employment decisions with respect to all but five positions which became available at the Dunkirk facility between February 2006 and April 2007. *See* Item 65, p. 6; *see also* Item 58, pp. 7-8. Accordingly, the court will limit its application of the *McDonnell Douglas* burden-shifting framework to these five specific job actions.

### 1. Job No. D2006-05, Utility Mechanic B

Defendant has submitted the "Bid Package" for this position, which indicates that the position was first posted on February 3, 2006, with a "Bid Close Date" of February 10, 2006 (ten days after plaintiff returned to work at NRG). *See* Item 57-14. The "Bid Log Sheet" indicates that no "Regular" status employees bid on that position. As set forth in the CBA, and as explained by Mr. Leikam during his deposition, "Temporary" status employees could "express their interest" in the position, but NRG was not contractually obligated to offer them the job. Rather, under the CBA, NRG could consider "outside" candidates to fill the opening. *See* CBA, Appendix A, Section B(3)(b) (Item 57-3, p. 41); *see also* Leikam Dep.(Item 56-4), p. 47.

Along with plaintiff, two other internal "Temporary" employees– both Caucasian males with greater seniority than plaintiff– expressed interest in this job opening: Mark Wischnewski, with a Seniority Date of April 26, 2004; and Michael Batchen, with a Seniority

Date of July 10, 2005.  *See* Item 57-14.  Neither of these employees were awarded the Utility Mechanic B job.  Instead, the job was awarded to an "outside" candidate who had a Master Electrician License and an Associate's Degree in Maintenance Electricity and Construction Technology.  *See* Item 57-9.  Based on this undisputed evidence, it is clear that two Caucasian male employees with the same "Temporary" status as plaintiff, but with more seniority, were also passed over for this job in favor of an external applicant with superior qualifications, as NRG was permitted to do under the terms of the CBA.  Accordingly, there is no basis upon which a rational trier of fact could conclude that this employment decision occurred under circumstances giving rise to an inference of discrimination.

    **2.**    **The Four Remaining Job Actions: Vacancy No. D2006-25, Utility Mechanic B; Vacancy No. D2006-33, Coal Handler B; Vacancy No. D2007-03, Utility Mechanic B; Vacancy No. D2007-12, Utility Mechanic A**

There is no dispute that the remaining four employment actions challenged in this lawsuit involve hiring decisions made by Carson Leikam, the Operations Manager at NRG's Dunkirk plant, subsequent to plaintiff's telephone call to Mr. Leikam in August 2006.  As revealed during discovery, plaintiff's telephone to Mr. Leikam was precipitated by the circumstances surrounding the posting of Vacancy No. D2006-25, Utility Mechanic B, Dunkirk.  This position was first posted on July 18, 2006, with a Bid Close Date of July 25, 2006.  *See* Item 57-4, p. 2.  Also posted that same day was Vacancy No. D2006-23, Coal Handler B, Dunkirk.  Item 57-19.  The "Bid Log Sheets" indicate that plaintiff and Michael Batchen submitted bids for both of these positions.  Item 57-4, p. 3; Item 57-19, p. 3.

At his March 31, 2011 deposition in this action, plaintiff testified that he called Mr. Leikam after being informed by a co-worker that Mr. Batchen was awarded the Coal Handler B position (No. D2006-23).[5] Plaintiff knew that Mr. Leikam was the person in charge of interviews and hiring at the Dunkirk facility. During the phone call plaintiff asked Mr. Leikam when he would be interviewed for the Utility Mechanic B position (No. D2006-25). *See* Item 56-2, pp. 87, 90. Mr. Leikam responded that, as a temporary employee, plaintiff had no bidding rights under the CBA. *See* Item 56-4 (Leikam Dep., 4/26/2011), p. 98. Mr. Leikam testified the he was surprised by the "abruptness" of plaintiff during the phone call, and considered the tone of the call "pretty much as a demand" for an interview. *Id.* at 97-98.

After the phone call, Mr. Leikam reviewed plaintiff's resume. He described it as "shoddy," with several spelling, typographical, and grammatical errors, as well as inaccurate descriptions and overstatements of plaintiff's job duties at NRG. *Id.* at 110, 123-27, 130. Mr. Leikam also expressed concern about the gaps in plaintiff's work history, and noted that the length of time plaintiff had spent as a Temporary worker at the Huntley plant raised questions about the quality of his job performance. *Id.* at 106-07, 126.

Based on these concerns, Mr. Leikam made the unilateral decision not to interview plaintiff for the Utility Mechanic B job. He testified that, for these same reasons, he did not consider plaintiff to be a viable candidate for any of the remaining three jobs plaintiff bid on subsequent to August 2006– *i.e.*, Vacancy No. D2006-33, Coal Handler B, Dunkirk; Vacancy No. D2007-03, Utility Mechanic B, Dunkirk; and Vacancy No. D2007-12, Utility

---

[5] As discussed in the text above, plaintiff has conceded that the Coal Handler B position was properly awarded to Mr. Batchen based on seniority.

Mechanic A, Dunkirk. *See* Item 56-4, pp. 202-07. Mr. Leikam clearly summarized the factors impacting these decisions, including the unfavorable impression plaintiff made during the telephone call; plaintiff's work history , as reflected in the resume, indicating that he was not a stable or productive employee; and the "shoddy" nature of the resume, which was filled with typos, misspellings, grammatical errors, inaccuracies, and overstatements. *Id.* at 110. Mr. Leikam testified that he, alone, made the decision not to interview plaintiff for these positions. *Id.* at 110-11.

Plaintiff contends that the circumstances under which he was denied an interview give rise to an inference of unlawful discrimination–namely, that plaintiff was the only Asian employee who bid on these jobs; that he was well-qualified for the Utility Mechanic B and Coal Handler B positions at the Dunkirk facility, having performed the duties of these jobs as a full-time temporary employee at the Huntley facility; and, that the positions were ultimately filled by external Caucasian applicants with no seniority or other enforceable rights under the CBA. However, even if these circumstances should be deemed sufficient to satisfy plaintiff's *prima facie* Title VII burden, there is nothing in the evidence presented on the summary judgment record to support a finding by a rational jury that the legitimate, non-discriminatory reasons proffered by Mr. Leikam were false, and that more likely than not discrimination was the real reason for the employment decisions. Rather, the preponderance of the evidence establishes that Mr. Leikam's employment decisions were based on his impressions of plaintiff's suitability for the positions following the August 2006 telephone call; his review of plaintiff's resume; and his consideration of the qualifications of other candidates in accordance with the bidding procedures outlined in the CBA. As reflected by this court's scrutiny of the well-developed summary judgment record, there is

simply no proof that these entirely lawful considerations were in any way influenced by plaintiff's race or national origin.

For example, Mr. Leikam testified that he had no idea plaintiff was of Asian descent until he received notice of the claims in this lawsuit. Item 56-4, p. 196. Mr. Leikam had never met plaintiff prior to his deposition on April 26, 2011, and the only time they ever spoke was the short (3-4 minute) telephone call in August 2006. *Id.* at 195. Mr. Leikam testified that he did not recall plaintiff speaking in broken English or with any type of dialect, and he had no difficulty understanding plaintiff. *Id.* at 99, 194-95. Significantly, Mr. Leikam also provided personal testimony regarding his adopted son, who was born in Korea and is of Asian descent. Mr. Leikam and his wife adopted their son when he was eight months old. He is now in his early twenties, working as a financial consultant following graduation from SUNY Fredonia. Mr. Leikam testified that the experience of raising a Korean child was a challenging but rewarding one, and described instances of racial bias that his family endured during his childhood. *Id.* at 207-11. In addition, Mr. Leikam testified at some length about the qualifications of the individuals who were awarded these four challenged positions. In each case, the external candidate chosen had significant relevant work experience and was deemed more qualified for the position than plaintiff. *Id.* at 200-07. Taken as a whole, this testimony is clearly sufficient to rebut any inference of discrimination to be drawn solely from the circumstance of plaintiff's Laotian national origin.

Indeed, having examined the entire record, the court finds no factual basis whatsoever to support a rational inference that Mr. Leikam's unilateral decisions regarding these four positions were in any way based on plaintiff's race or national origin. Despite ample opportunity during discovery, plaintiff has failed to come forward with any evidence,

apart from his conjecture and speculation, "upon which a reasonable trier of fact could base the conclusion that discrimination was a determinative factor" in the challenged hiring decisions. *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000). In the absence of such evidence, plaintiff cannot satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *see also Butts v. N.Y.C. Dep't of Hous. Pres. and Dev.*, 307 F.App'x. 596, 599 (2d Cir. 2009).

Accordingly, there are no genuine issues of material fact for trial on plaintiff's Title VII claim of disparate treatment on the basis of race and nationality, and summary judgment is appropriate in favor of defendant dismissing this claim as a matter of law.

### B.     Hostile Work Environment

Plaintiff also claims that he was subjected to a hostile work environment as the result of offensive conduct by non-management co-workers, forcing him to resign from NRG in June 2007. Specifically, he claims that Matt Peacock would dance around singing "keep on waiting, keep on waiting" when plaintiff failed to get a promotion. *See* Item 56-2, p. 43. He also alleges that Richard Jaczka called plaintiff a "V.C." and "Commie," and told him that he used to kill people like plaintiff during the Vietnam War. *Id.* at 43, 313-14. Plaintiff claims that he complained about this conduct to his supervisor, Art Ridler, but no corrective action was taken.

To prevail on this claim, plaintiff must establish (1) that his workplace was permeated with discriminatory intimidation, ridicule and insult sufficiently severe or pervasive to alter the conditions of his work environment; and (2) that a specific basis exists for imputing the

conduct that created the hostile environment to the employer. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). The conduct in question "must be severe or pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Schwapp*, 118 F.3d at 110 (quoting *Harris*, 510 U.S. at 22). "In other words, the first element of a hostile work environment claim requires allegations that demonstrate that the environment was both objectively and subjectively hostile and abusive." *Phillips*, 2010 WL 1269772, at *7 (citing *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)).

In evaluating whether a work environment is sufficiently hostile or abusive, courts consider all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with [the] employee's work performance." *Harris*, 510 U.S. at 23; *see also Feingold*, 366 F.3d at 150. The incidents in question "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. … Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Alfano*, 294 F.3d at 374 (internal quotation marks and citations omitted).

In this case, plaintiff has identified only a few isolated episodes of offensive conduct on the part of his co-workers, falling far short of the type of "extraordinarily severe" or "continuous and concerted" conduct found by the courts to be sufficiently pervasive to have altered the conditions of the working environment. No facts have been discovered or alleged to indicate that Mr. Peacock did or said anything relating to plaintiff's race or national origin on the occasions when he would sing or dance, or that Mr. Jaczka made his

comments on more than one or two occasions. While the conduct alleged, if believed by a rational trier of fact to be true, could certainly be perceived as offensive or inappropriate, "[i]t is well settled that Title VII is not intended to act as a 'general civility code' and that sporadic objectionable or inappropriate comments and behavior simply will not rise to the extreme level of behavior necessary to prove a hostile work environment." *Hannah v. One Commc'ns*, 2011 WL 5282633, at *7 (W.D.N.Y. Sept. 28, 2011) (quoting *Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004)).

In addition, it is undisputed that when plaintiff left his employment with NRG, he was given an exit interview during which he was provided the opportunity to complain about any problems he experienced at NRG. Plaintiff indicated on the Exit Interview Form that he would recommend NRG to others as "a good place to work." Item 57-12, p. 3. The record also reveals that plaintiff re-applied for employment at NRG in April and May 2011, after he was deposed in this lawsuit. Based on this evidence, no rational trier of fact could conclude that plaintiff subjectively viewed his work environment as hostile or abusive.

Finally, plaintiff has failed to come forward with any evidence to show or suggest that a specific basis exists for imputing the conduct that created the hostile environment to the employer. He alleges that he reported the alleged incidents of offensive conduct to his supervisor, Art Ridler, but no action was taken. However, Mr. Ridler testified at his deposition in this action that plaintiff never complained to him about discrimination or harassment on account of his race. Item 56-3 (Ridler Dep.), p. 90. Plaintiff also testified that, although he signed a statement of commitment indicating that he had read and understood NRG's written employment policy addressing discrimination and harassment in the workplace (*see* Item 57-7, NRG Code of Conduct, Sections IV(B) and VII), he failed

to follow the procedures set forth in that policy for reporting suspected discrimination, intimidation, or harassment to management. *See* Item 56-2, pp. 276-90. And, as discussed above, he did not take advantage of the opportunity provided during his exit interview to advise NRG management of his co-workers' offensive conduct.

Based on this undisputed evidence, the court finds that no reasonable jury could return a verdict for plaintiff on his hostile work environment claim. Accordingly, defendant is entitled to summary judgment dismissing this claim as a matter of law.

## **CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment (Item 56) is granted, and the complaint is dismissed in its entirety.

The Clerk of the Court is directed to enter judgment in favor of defendant.

So ordered.

                                             \s\ John T. Curtin
                                                JOHN T. CURTIN
                                           United States District Judge

Dated: April 11, 2012
p:\pending\2010\10-147.mar22.2012